# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs August 24, 2010

## STATE OF TENNESSEE v. WILLIAM TOBY JOHNSON

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 270432     Don W. Poole, Judge**

---

**No. E2009-02374-CCA-R3-CD - Filed September 26, 2011**

---

The Hamilton County Grand Jury returned an indictment against Defendant, William Toby Johnson, charging him with aggravated burglary, resisting arrest, and four counts of aggravated robbery. By agreement, count six of the indictment was amended to charge attempted aggravated robbery rather than aggravated robbery. It also appears that the resisting arrest charge was dismissed before trial. At trial, following the close of the State's proof, the trial court granted Defendant's motion for a judgment of acquittal regarding the aggravated robbery of Luis Lopez, and the charge was reduced to robbery. The jury convicted Defendant of aggravated criminal trespass, theft of property valued under $500 from Luis Lopez, and two counts of the lesser-included offense of robbery involving Edgar Perez and Valentina Soto Santizo. Defendant was sentenced to eleven months and twenty nine days each for aggravated criminal trespass and theft, and fifteen years for each robbery conviction. The trial court ordered the two robbery sentences to run concurrently with each other but consecutively to the other two sentences. On appeal, Defendant argues: (1) that the evidence was insufficient to support his convictions; (2) that the trial court erred in allowing the State to introduce an audio recording of the 911 call made by one of the victims at the time of the offenses; and (3) that his sentence is excessive. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

Daniel J. Ripper, Chattanooga, Tennessee, for the appellant, William Toby Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General, William H. Cox, District Attorney General; Cameron Williams, Assistant District

Attorney General; and Lance Pope, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

Officer Zachary Moody of the Chattanooga Police Department testified that around 2:30 a.m. on January 16, 2008, he was dispatched to a burglary in progress at 1911 East 14th Street. He arrived within a block of the address and turned his lights off so that the suspects in the house would not see him approaching the residence. Officer Moody then exited his car and was standing by an intersection waiting for other officers when he saw two people, later identified as Defendant and Michael Orr, leaving the house. The two men walked down the sidewalk in front of him, and when Officer Moody attempted to talk to them, they ran down 14th Street. Officer Moody ran after the two men and eventually caught Mr. Orr, who was wearing dark clothing and a black hoodie. Defendant was later apprehended by Officer Michael Wenger. Officer Moody testified that the two men dropped a drawer filled with change as they ran, and he found several sets of car keys in the front yard of the residence. He acknowledged that he briefly lost sight of Defendant and Mr. Orr during the chase.

Chattanooga Police Officer Michael Wenger testified that he responded to the call and just before arriving at the residence, he heard Officer Moody radio and say that he had "individuals running," and Officer Moody gave a description of them. Officer Wenger then saw Officer Moody run across 14th Street behind two individuals, and he followed them in his patrol car. The two suspects split up, and Officer Wenger chased one in his patrol car, and Officer Moody chased the other on foot.

Officer Wenger testified that he chased the man, later identified as Defendant, down an alley and Defendant jumped a fence and fell over to the other side. Officer Wenger got out of his car and attempted to "Tase" Defendant; however, the Taser malfunctioned. There was also a pit bull dog inside the fence, so Officer Wenger ran around it and continued running after Defendant. At the time, he was on the radio telling other officers where Defendant was going. Officer Wenger testified that he briefly (ten to twenty seconds) lost sight of Defendant as he ran around the fence, and another officer then saw someone at the top of some stairs leading to the back door of a house. Officer Wenger ran to the area and saw Defendant standing at the top of the stairs, and he refused to come down. After the officers talked to him, Defendant came down and was taken into custody after a brief struggle. Officer Wenger placed Defendant in another officer's car, and Defendant was taken back to the scene on 14th Street.

Valentina Solo Santizo testified that she lived at 1911 East 14th Street with her husband, Isaias Godinez Lopez, and their two children. She had lived there for two years and was living there on January 16, 2008, with Isaias and their oldest child. She was pregnant with her second child at the time. Also residing there were her husband's brothers, Luis Lopez and Hector Lopez; Hector's friend Oliver Lopez; and someone named Edgar. Mrs. Santizo testified that she was working at the Angelica Health Care Center on January 16, 2008, and arrived home around 1:00 a.m. Her husband and brother-in-law, Luis, arrived shortly thereafter. Hector was in the front living room watching television, and Edgar and Oliver were in their rooms asleep.

Mrs. Santizo testified that about an hour after she got home, two black men wearing dark clothing entered the house through the back door. She did not actually see the men enter the house, but she first saw them in the kitchen. She said that although the kitchen door had a deadbolt, she was not sure if it was locked because the door was rarely used. Ms. Santizo testified that she and her husband were in a living room that adjoined the kitchen when the men entered the house, and the men told them not to move. Ms. Santizo testified that one of the men had a piece of metal, and she looked down because she was "very, very scared." She said that the two men had been in her bedroom and took some of her jewelry, although she did not see them take it. At some point, Mrs. Santizo went to her bedroom to check on her daughter. As she walked to the room, she knocked on Edgar's door and told him to call the police.

Mrs. Santizo testified that she did not give the two men permission to enter the house or to take her belongings. She did not remember speaking with police later that night or if any of them spoke Spanish. Mrs. Santizo testified that Edgar spoke with police because he speaks a little English. She was also unable to identify Defendant in court because "it is so long that I really do not remember very well." Mrs. Santizo testified that police later returned her jewelry to her. She admitted that she was in the United States illegally from Guatemala, and she had obtained a social security number by giving false information. She did not remember testifying at the preliminary hearing that three people came into the house but that one of them ran away.

Hector Lopez testified that he is also from Guatemala and had been in the United States for seven years. On January 16, 2008, he was working at Pilgrim's Pride and arrived home a little after 1:00 a.m. He said that Oliver and Edgar were sleeping, and Valentina, Isaias, and Luis were in the dining room. Hector testified that he ate something and was watching soccer in the living room by the front door when four men in dark clothing entered the house through the kitchen door and told them not to move. Some of the men were wearing hats, and one of them had a crowbar and threatened to hit him if he moved. Hector said that the men separated and began searching everywhere. He was searched by Defendant

who did not find anything. However, Defendant did find a key in one of the sofas but it did not fit any of the cars parked at the residence.

Hector testified that he was afraid while the men were in the residence. He said that the men left one by one, and two of them left through the front door. Hector testified that Defendant was one of the last two men to leave the residence. The man with the crowbar was also one of the last two to leave, and he left the crowbar in the house. According to Hector, all four men were wearing dark clothing, and he had never seen them before. He said that the back door had two locks, but one did not work at the time. Hector testified that Spanish is his native language, and he spoke with a police officer on the scene who spoke very little Spanish. Hector admitted that he was in the United States illegally, and he used someone else's social security number for work purposes.

Luis Godinez Lopez testified that he was working at Pilgrim's Pride on January 16, 2008, and he left work around 1:00 a.m. and went straight home. He was in his bedroom in the dark, talking on his cell phone to his girlfriend, Natividad, when he first realized that "someone" was in the house. Luis testified that he told Natividad to call police and that he would call her back later. He then hung up and threw the phone under the bed. Luis testified that Defendant, who was wearing dark clothing, came into the room, grabbed him, and yanked a gold chain, with his name engraved on it, off of his neck breaking the clasp. Luis testified that he was afraid that Defendant was going to do something to him. He later received his necklace back from police. Luis testified that there was a deadbolt lock on the kitchen door, but they only used the lock on the handle. He admitted that he was in the United States illegally, and he was working without a social security number. He also did not pay any taxes. Luis testified that Isaias signed the release for his necklace because Luis did not have any identification, and Isaias had a passport.

Edgar Perez, a native of Guatemala, testified that he had lived in the United States for six years and was employed by Tennessee Enterprise. He had lived at 1911 East 14th Street for five years, and his name was on the lease. He admitted that he was in the country illegally and did not pay taxes on his earnings. Edgar testified that he left work around 5:30 p.m. on January 16, 2008, and he went to bed around 10:30 p.m. At some point, Valentina woke him up and told him to call police because there were intruders in the house. Oliver Lopez was also in the room. Edgar got out of bed and dialed 911. A recording of his call was played for the jury. Edgar testified that a man dressed in black clothing and carrying a piece of metal later entered his bedroom and turned on the light. The man told him and Oliver not to move. He then took $120 from Edgar's wallet that was in his pants on the floor beside the bed. The man also took Edgar's keys and a box of change. Edgar testified that he had never seen the man before and never gave him permission to enter the home. He said that police later returned his items to him.

Officer Jerry McElroy of the Chattanooga Police Department testified that he was working as a detective in the burglary and robbery division on January 16, 2008. He was dispatched to 1911 East 14th Street a little after 2:00 a.m. Two men, including Defendant, were in custody when he arrived. Officer McElroy testified that he picked up a drawer and "a lot of change" that was on the sidewalk in front of the victims' house. He also found some keys. The items were later released to Edgar Perez. Officer McElroy testified that he walked inside the house and collected a tire iron from the living room.

Officer McElroy testified that Edgar Perez was the only witness at the scene who spoke any English, and Officer McElroy spoke very little Spanish. He said that the other witnesses told "where they were and what happened during that incident, during this incident" through Mr. Perez, and Officer McElroy got enough information "to where [he] felt like [he] understood that was going on..." Through his investigation, Officer McElroy determined that Edgar Perez was in his room asleep when the incident occurred and did not see anything.

Officer McElroy testified that the victims reported that Defendant and Michael Orr entered the residence through the back door and that he photographed the door. He inspected the door, which had two locks, and determined that only the bottom lock was functioning. Officer McElroy testified that he went back to the residence and checked the lock before trial. He easily made entry into the house with the bottom lock engaged by sliding a shopping card between the lock and the door frame. Officer McElroy testified that Defendant and Michael Orr were eventually transported to the "service center," and he searched both of them. He recovered a gold necklace with the name "Luis" on it, a wallet, and $13.40 from Mr. Orr. Officer McElroy testified that he recovered several pieces of ladies jewelry and $133.70 from Defendant. He returned the jewelry, except for a watch, to Valentina Santizo and $120.00 to Edgar Perez because that was the amount that Mr. Perez reported missing.

The forty-two-year-old Defendant testified that he was living at 1711 South Beech street on January 16, 2008, and he was working at Orchard Knob Baptist Church as a youth director. Defendant said that during that time period, he was smoking marijuana and drinking a lot because was dealing with a divorce, his mother had died, one of his children was in jail and the other child was pregnant. He admitted that he had been previously convicted of theft under $500 and theft over $500, and he was convicted in a fraud case in Lowndes County, Georgia. Defendant also admitted that he had a conviction for introducing contraband into a penal institution.

Defendant claimed that he knew the victims living at 1911 East 14th Street because they bought pills and cocaine from him. He said that he was paid in cash, but the victims

sometimes paid him other ways. Defendant testified that he would "front drugs" to the victims, and they were sometimes late paying him. He felt that on the night of January 16, 2008, the victims were not going to pay him for his "products." Defendant testified that he was at home during the day on January 15, and his friend and co-defendant, Michael Orr stopped by that evening, and they played video games and "smoked maybe a blunt of weed." He said that around 12:30 or 12:45 a.m., he and Mr. Orr ran out of beer, so they walked to a store to buy more. He then asked Mr. Orr to "[w]alk up two blocks" with him to the victims' residence to collect some money that they owed him. Defendant testified that he tapped on the back door and made a whistling sound which was the signal for the victims to let him in.

Defendant testified that Valentina let him in the house, and he told her "Edgar owe [sic] me 150, Luis owe [sic] me $200." He said that Valentina told him to wait a minute, and she left. Defendant testified that he followed her and stood in the den and watched as she knocked on Edgar's bedroom door. He said that Edgar got up and gave Valentina $120. Defendant testified that when Valentina came back to him, he informed her that Edgar owed him $150. He said that Valentina went and told Edgar something else in Spanish and again told defendant to wait a minute. She then went to Luis' room and knocked for four or five minutes. Defendant claimed that Luis answered the door complaining about "the pills that keep your energy up while he was at work or something, they was talking about something at work and the pills wouldn't keep his energy up, and she went inside, she come back out, she told me to wait a minute." Defendant said that Valentina returned with some jewelry wrapped in something with pins on it. She then walked to Edgar's door and walked back to Defendant and said, "Leave , police, don't come back no more, don't buy no more drugs from you." Defendant said that Edgar, who was on the phone, came to the door and gave Valentina a wooden box of change. Defendant then took the change and left the house. He saw a police car parked twenty to twenty-five feet from the corner of the house, and it was normal for police to sit in the area because it was a "high drug area."

Defendant testified that he got about thirty-five to forty feet down the street when the officer told them to "halt." He said that he had maybe six rocks of cocaine and thirteen pills on him, so Defendant dropped the change and ran. He was apprehended approximately a block and a half from his residence. Defendant testified that he did not bring a tire iron to the residence, and he never threatened the victims. He also said he did not prevent anyone from using their cell phone or go into anyone's bedroom. Defendant testified that Hector walked in while he and Mr. Orr were in the house and sat down on the couch. He and Mr. Orr did not pat down Hector or Isaias or take anything from Isaias' pockets.

On cross-examination, Defendant testified that he studied the Bible during the day and sold drugs at night. He did not believe that it was illegal to sell or possess cocaine.

Defendant testified that the victims, who worked second shift, told him that the cocaine and pills that he sold them did not give them a boost. He refused to reveal his drug sources and said that he normally purchased a "Gram or two" once a month to resell. Defendant testified that he was dressed in black on the night of the offenses because it was a way to remain concealed from police while he was selling drugs. He said that he threw away the drugs that he had on his person when police began chasing him.

Defendant claimed that he actually had $850 from "pills and hustling" when police stopped him. He did not know what happened to the rest of the money after his arrest. Defendant testified that Valentina gave him the jewelry because Luis did not have the money that he owed. He agreed that the clasp on the gold necklace looked like it was "off a little bit," but he did not yank it off Luis' neck. Defendant testified that although Valentina did not speak English, he could "sense" what she was saying to him. He admitted that he was on probation for theft and contraband in a penal institution when he was buying and selling drugs. Defendant testified that he did not take any keys from the victims, and he was not aware that Valentina was pregnant at the time of the offenses. He said that he ran when the officer told him to stop and dropped the box of change. He then jumped the fence to get away and ran up some stairs.

**Analysis**

*A. Sufficiency of the Evidence*

Defendant argues that the evidence was insufficient to support his convictions of aggravated criminal trespass, theft of property valued under $500, and two counts of robbery. More specifically, he argues that the victims' testimony was inconsistent and that he was only in the house to collect a drug debt.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id*.; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given

the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

"A person commits aggravated criminal trespass who enters or remains on property when . . . [t]he person knows the person does not have the property owner's effective consent to do so; and . . .[t]he person intends, knows, or is reckless about whether such person's presence will cause fear for the safety of another." T.C.A. § 39-14-406(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103. Finally, "[r]obbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a)(2006).

Viewing the evidence in a light most favorable to the State, the proof established that Defendant and Michael Orr entered the victims' residence at 1911 East 14th Street without their permission through the back door. Valentina Santizo testified that when the men entered the home, one of them had a piece of metal and told her and her husband not to move. She was very scared and looked down. She said that the men had been in her bedroom and took some of her jewelry without permission.

Luis Lopez identified Defendant at trial and testified that Defendant entered his bedroom, grabbed him, and yanked a gold chain, bearing his name, from his neck, breaking the clasp. Luis testified that he was afraid Defendant was going to do something to him. Edgar Perez testified that he was sleeping when Valentina knocked on the door and told him to call police because there were black men in the house. Edgar then got out of bed and dialed 911. A man dressed in black and carrying a piece of metal later walked into Edgar's bedroom and turned on the light. The man told Edgar not to move and took $120 from his wallet. He also took Edgar's keys and a box of change. Edgar testified that he was scared.

Officer Zachary Moody responded to the scene and saw Defendant and Michael Orr leaving the house. He attempted to speak to the two men but they ran. Officer Moody eventually caught Mr. Orr, and Defendant was later apprehended by Officer Michael Wenger who had arrived in the area. Defendant and Mr. Orr dropped a drawer of change as they fled, and Officer Moody found several sets of keys in the front yard of the residence at 1911 East 14th Street. Officer Jerry Moody later search Defendant after he was taken to the police

station, and he found several pieces of ladies jewelry and $133.70 in cash. He searched Mr. Orr and found a gold necklace bearing the name "Luis."

The jury heard Defendant's testimony concerning his role in the offenses and obviously, by its verdict, accredited the testimony of the State's witnesses and resolved any inconsistencies in the testimony in favor of the State. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003). Based on our review of the evidence, we conclude that the evidence was sufficient to support beyond a reasonable doubt Defendant's convictions of aggravated criminal trespass, theft of property valued under $500, and two counts of robbery. Defendant is not entitled to relief on this issue.

### B. Admission of 911 Tape

Defendant next contends that the trial court erred in allowing the State to introduce into evidence a recording of the 911 call made by Edgar Perez on the night of the offenses. He argues that the State failed to authenticate the tape by having an employee of the 911 Call Center testify. He further claims that statements on the tape made by the 911 operator are inadmissable hearsay.

Tennessee Rule of Evidence 401 provides that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. "The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." *State v. Biggs*, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997)).

At trial in this case, prior to Edgar Perez's testimony, Defendant objected to the admission of the tape of the 911 call made by Mr. Perez on the night of the offenses because the State did not have anyone from the 911 center to authenticate the tape. The State responded that Edgar could authenticate the tape since he was the caller. During an offer of proof by the State, Edgar testified that he called 911 on the night of the offenses and informed the operator that there was someone inside the house. He said that he would be

able to identify his voice on the tape. Defense counsel than stated, "Even without playing the tape, Your Honor, there is no hearsay exception, and this is hearsay because it's a statement of declarant made out of court." Counsel also noted that there was no hearsay exception for prior consistent statements and that the statement could only be admitted as an excited utterance. The State responded that Edgar's statements were excited utterances because the call related to the startling event of the intruders being inside the house. The State then played the recording of the 911 call. Edgar identified his voice on the tape and said that it accurately reflected how the conversation with the operator took place.

The trial court then asked the State about the purpose of offering the evidence. The state responded:

> Well, the main purpose is to show, I guess, the effect that this situation had on Mr. Perez. We're not offering it for the truth, necessarily, he's here subject to cross-examination, he can testify about that, but we want to show the effect or the impact this had on Mr. Perez at the time this happened.

Defense counsel reiterated his argument that someone from the 911 center had to authenticate the tape, and he argued that there was no proof that the recording was a 911 call. Counsel also pointed out that there were other voices on the tape besides that of Mr. Perez.

The State argued that it was not necessary to call someone from the 911 center because Edgar could testify that he dialed 911 on his phone and the operator was the person he talked to. Edgar then told the court that he dialed 911 on his telephone, and the voice on the tape was the lady that he talked to on the phone. He again identified his voice on the tape and said that he made the call while the men were in his house. Edgar testified that he told the lady the men were in the house, and he was scared when he made the call. He said that the tape accurately reflected the conversation he had with the lady. The State then told the trial court that another reason for wanting to introduce the tape was to establish that Mr. Perez was afraid of some violence, which was an element of the charged offense of aggravated robbery. The prosecutor stated: "He's testified there was a startling event, that this call was placed during that event, and that the statement is about that event." The State noted that it did not oppose a limited instruction on what the jury could consider on the tape.

The trial court, referencing Tenn. R. Evid. 901, noted that there "are more ways than one to authenticate the 911 tape." The court further stated: "this person has identified and said I called 911 and this is what I said. So I think he has properly authenticated the tape." The trial court further found that the tape was an excited utterance.

-10-

The authentication of evidence is governed by Tennessee Rule of Evidence 901. The rule provides that authentication may be made by the following: "(5) *Voice Identification*. Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Tenn. R. Evid. 901 (b)(5). The rule further provides that the "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter is what its proponent claims." Tenn. R. Evid. 901(a).

We hold that the trial court in this case did not abuse its discretion in allowing the State to present the 911 tape. Edgar Perez testified that he dialed 911 on his telephone. He identified his voice on the recording of the call and said that the voice on the tape was the lady that he talked to on the phone. He said he made the call while the men were in his house and that he told the operator that the men were in the house. Mr. Perez also said that the tape accurately reflected the conversation he had with the operator. Therefore, an adequate foundation was presented to authenticate the 911 tape. *See State v. Ricky Lynn Payne*, No. M2006-00762-CCA-R3-CD, 2007 WL 2042484, at *8 (Tenn. Crim. App. July 1, 1997) *no perm. app. filed* (concluding that a tape of a 911 call was authenticated then the 911 operator identified her own voice on the tape and testified that it was from the shooting).

Defendant further argues that statements by the 911 operator on the tape constitute inadmissible hearsay and unlike the statements by Mr. Perez, do not qualify as excited utterances. However, Defendant only broadly argues that statements by the operator are hearsay. He does not specify which parts of the tape are hearsay. A hearsay statement is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial unless it falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." *State v. Stout,* 46 S.W.3d 689, 697 (Tenn. 2001). As such, we will not reverse the trial court's ruling absent a showing that it abused its discretion. *Id*.

We agree with the State that statements made by the operator on the tape do not constitute hearsay because it does not appear that they were admitted to prove the truth of the matter asserted. The 911 operator was merely attempting to gain information from the caller. Even if it were error for the trial court to admit statements by the 911 operator, any error is clearly harmless.

We conclude that the trial court did not abuse its discretion in admitting the 911 tape into evidence. Defendant is not entitled to relief on this issue.

*C. Sentencing*

Defendant contends that the sentence imposed by the trial court is excessive. He also complains that the trial court imposed his sentences for aggravated criminal trespass and theft of property, two Class A misdemeanors, and two robberies, both Class C felonies, in violation of *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and that the trial court erred in ordering consecutive sentencing.

Defendant stipulated that he was a Range III, persistent offender. The trial court noted that he had eleven prior felony convictions, five of which were used to classify him as a persistent offender. The felony convictions included various convictions for theft of property, introducing contraband into a penal facility, grand theft, receiving stolen property, and second degree burglary. As a Range III, Defendant was subject to a sentence range of between ten and fifteen years for each of the two Class C felony convictions for robbery. T.C.A. § 40-35-112. The trial court applied the following enhancement factors: the Defendant has a previous history of criminal convictions or criminal behavior; the Defendant failed to comply with the conditions of a sentence involving release into the community; and Defendant was on probation at the time of the offenses. T.C.A. § 40-35-114(1), (8), and (13). The court found that no mitigating factors were present.

Based on the presence of the enhancement factors and the great weight attributed to the number of Defendant's prior convictions, and the lack of mitigating factors, the trial court sentenced Defendant, as a Range III, persistent offender, to fifteen years for each robbery conviction. Defendant was also sentenced to eleven months and twenty nine days each for the misdemeanor aggravated criminal trespass and theft convictions.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is improper. *See* T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also State v. Arnett,* 49 S.W.3d 250, 257 (Tenn. 2001). When a Defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correctness, however, " 'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.' "*State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 Tenn. 1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the

presumption of correctness fails," and our review is *de novo. Carter*, 254 S.W.3d at 345 (quoting *State v. Pierce*, 138 S.W.3d 820, 827 (Tenn. 2004); *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992)).

*Enhancement Factors*

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." *Carter*, 254 S.W.3d at 346. Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections-102 and-103 of the Sentencing Act." *Id*.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the Defendant wishes to make in the Defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); *see also Carter*, 254 S.W.3d at 343; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002).

In this case, Defendant argues that his sentences are excessive based on facts not admitted by Defendant or found by a jury in violation of *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

Effective on June 7, 2005, the Tennessee Legislature amended the sentencing code to comply with the *Blakely* decision. Defendant's conduct in this case occurred subsequent to the enactment of the 2005 amendments and therefore *Blakely* does not apply. In *Carter*, the Tennessee Supreme Court clarified the 2005 changes in Tennessee sentencing law and stated:

> [A] trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion. Since the Sentencing Act has been revised to render these factors merely advisory, that discretion has been broadened. Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not

increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence.

*Carter*, 254 S.W.3d at 345-46.

Thus, a trial court's "fail[ure] to appropriately adjust" a sentence in light of applicable, but merely advisory, mitigating or enhancement factors, is no longer an appropriate issue for appellate review. *Id.*, 254 S.W.3d at 345 (citing *State v. Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App., at Jackson, July 6, 2007) (noting that "[t]he 2005 amendment [to the Sentencing Act] deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered the enhancement and mitigating factors merely advisory, not binding, on the trial courts").

Misdemeanor sentencing is controlled by Tennessee Code Annotated section 40-35-302, which provides, in part, that the trial court shall impose a specific sentence that is consistent with the purposes and principles of the 1989 Sentencing Reform Act. *See* T .C.A. § 40-35-302(b). A separate sentencing hearing is not required in misdemeanor sentencing, but the trial court must "allow the parties a reasonable opportunity to be heard on the question of the length of any sentence and the manner in which the sentence is to be served." T.C.A. § 40-35-302(a). A misdemeanor sentence, unlike a felony sentence, has no sentence range. *State v. Baker,* 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997).

The trial court is allowed greater flexibility in setting misdemeanor sentences than felony sentences. *State v. Johnson,* 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999). The trial court, however, must impose a specific sentence for a misdemeanor conviction consistent with the purposes and principles of the 1989 Criminal Sentencing Reform Act. T.C.A. § 40-35-302(d); *State v. Palmer,* 902 S.W.2d 391, 394 (Tenn. 1995). The trial court should consider enhancement and mitigating factors in making its sentencing determinations; however, unlike the felony sentencing statute, which requires the trial court to place its findings on the record, the misdemeanor sentencing statute "merely requires a trial judge to consider enhancement and mitigating factors when calculating the percentage of a misdemeanor sentence to be served in confinement." *State v. Troutman,* 979 S.W.2d 271, 274 (Tenn. 1998). " *Blakely* has no impact on a trial court's sentencing determinations involving misdemeanor convictions because there is no presumptive minimum for a misdemeanor sentence." *State v. Everett J. Dennis,* No. M2005-00178-CCA-R3-CD, 2006

-14-

WL 721301, at *4 (Tenn. Crim. App., Nashville, Mar. 21, 2006) (citing *State v. Brenda Bowers,* No. E2004-01275-CCA-R3-CD, 2005 WL 1827844 (Tenn. Crim. App., Knoxville, Aug. 3, 2005)).

The record reflects that the trial court considered the evidence presented at trial and the sentencing hearing. The court further considered the presentence report, the principles of sentencing and the arguments as to sentencing alternatives, the nature and characteristics of the offenses, the evidence offered by the parties on enhancement and mitigating factors, and the potential for rehabilitation or treatment.

In considering the enhancement factors, the trial court considered that defendant had eleven prior felony convictions and fourteen prior misdemeanor convictions. Five of the felony convictions were used to establish the range; however, the remainder of the convictions supported application of enhancement factor one. As for factor eight, the trial court noted that on multiple occasions, Defendant had failed to comply with a sentence involving release into the community. The presentence report reflects that Defendant had been placed on probation on numerous occasions and that his probation had been previously revoked on at least two occasions. In support of enhancement factor thirteen, the trial court considered that Defendant was on probation at the time of the offenses in this case. The presentence report reflects the Defendant was placed on probation in October of 2007 in two cases for a period of eleven months, twenty-nine days, and for a period of six months. The present offenses occurred in January of 2008.

The record clearly shows that the trial court followed the statutory sentencing procedure, made findings of facts that are adequately supported in the record, and gave due consideration to the principles that are relevant to sentencing. Based on our review, we conclude that the enhancement factors considered by the trial court adequately support the trial court's decision to impose a sentence of fifteen years for each felony robbery conviction and eleven months, twenty nine days for the misdemeanor convictions of aggravated criminal trespass and theft. Defendant is not entitled to relief on this issue.

*Consecutive Sentencing*

Defendant contends that the trial court erred in ordering the two robbery sentences to run concurrently with each other but consecutively to the misdemeanor sentences for aggravated criminal trespass and theft. A trial court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

-15-

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). The length of the sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), 103(2). Whether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court. *State v. Hastings*, 25 S.W.2d 178, 181 (Tenn. Crim. App. 1999).

In this case, the trial court found that consecutive sentencing was appropriate based on a finding that Defendant has an extensive record of criminal activity and that he was on probation at the time of the offenses. The trial court noted that Defendant had twenty-three prior convictions, including eleven felonies. Many of the convictions were theft-related, and Defendant had little work experience. Moreover, as pointed out by the State, Defendant admitted at trial that he sold drugs. A trial court may consider criminal behavior that did not result in a conviction. *State v. Koffman*, 207 S.W.3d 309, 324 (Tenn. Crim. App. 2006). This factor is supported by the record. *See State v. Pettus*, 986 S.W.2d 540 (Tenn. 1999)

(Defendant's seven prior convictions were sufficient to show that he had an extensive record of criminal activity).

The record further supports the trial court's finding that Defendant was on probation at the time of the offenses. As previously stated, Defendant was placed on probation in October of 2007 for a period of eleven months, twenty nine days, and for a period of six months. He committed the present offenses on January 16, 2008. Defendant admitted that he was on probation when the offenses *sub judice* were committed.

Based on Defendant's prior criminal history and the fact that he was on probation at the time of the offenses, Defendant has failed to show that the trial court erred in ordering consecutive sentencing. The presence of a single factor is sufficient to justify the imposition of consecutive sentences. *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). This issue is without merit.

## CONCLUSION

After a thorough review, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE